UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA
:
   - v -                                         12 Cr. 584 (JGK)
:
RANA KHANDAKAR, and
USAWAN SAELIM                             :

                Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT USAWAN SAELIM'S MOTION FOR PRETRIAL RELEASE

                                      PREET BHARARA
                                      United States Attorney for the
                                      Southern District of New York
                                      Attorney for the United States
                                           of America

JAMES J. PASTORE, JR.
Assistant United States Attorney
    - Of Counsel –

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                     :

UNITED STATES OF AMERICA
                                                     :

   - v -                                                    12 Cr. 584 (JGK)

                                                     :

RANA KHANDAKAR, and
USAWAN SAELIM                                 :

          Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT USAWAN SAELIM'S MOTION FOR PRETRIAL RELEASE

**Preliminary Statement**

The Government respectfully submits this memorandum in opposition to defendant Usawan Saelim's (the "defendant') November 20, 2012 letter ("Def. Ltr."), which seeks the defendant's release from pretrial detention.[1] As set forth in more detail below, the defendant was arrested on or about March 28, 2012 together with co-defendant Rana Khandakar. At the defendants' request, Magistrate Judge Henry B. Pitman adjourned the bail hearing to March 30, 2012. Following the bail hearing, Magistrate Judge Pitman concluded that both Khandakar and the defendant posed a risk of flight, and accordingly detained them. Among other things, Magistrate Judge Pitman found that the Government's case against both defendants was "extremely, extremely strong," and that the defendants appeared to be involved in a "massive fraud that went on for a substantial period of time and netted hundreds of thousands of dollars." (Transcript ("Tr.") at 25-26.) Magistrate Judge Pitman also noted that, as to Saelim, there was an

---

[1] By letter dated November 18, 2012, Saelim's co-defendant, Rana Khandakar, also seeks bail. Because the Government is engaged in fruitful discussions with defense counsel regarding Khandakar's proposed bail package, the Government will refrain from addressing his bail application at this time. The Government respectfully reserves its right to respond to Khandakar's application if the parties ultimately are unable to agree on a proposed bail package.

"aggravating fact . . . in that she is not a citizen and that her family ties to the United States appear to be limited to her mother, who is not currently in the United States." (Tr. at 25.)

Neither Saelim nor Khandakar appealed the detention order to the District Judge sitting in Part I.

A grand jury returned an indictment against the defendants on or about August 1, 2012, and the case was assigned to Your Honor. On August 8, 2012, the defendants appeared before the Court for their arraignment. Neither defendant sought a review of Magistrate Judge Pitman's detention order. On November 20, 2012 – more than 7 months after her initial bail hearing – Saelim filed the instant motion for bail.

As set forth in more detail below, there are no changed circumstances that warrant disturbing Magistrate Judge Pitman's detention order. To the contrary, the evidence against the defendant has only gotten stronger since her initial detention hearing. Moreover, the Government has uncovered additional losses stemming from the defendant's fraud, such that she now faces a higher sentencing Guidelines range than she did at the time of her initial bail hearing. Simply put, the defendant's incentive to flee has only increased since her arrest. Accordingly, the Court should order the defendant's continued detention pending her March 18, 2013 trial.

**Argument**

I.      Continued Detention Is Appropriate In Light Of The Defendant's Risk Of Flight

     A.     Applicable Law

Title 18, United States Code, Section 3142(e) provides that if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the

appearance of the person as required and the safety of any other person and the community," he or she shall order the defendant detained pending trial. 18 U.S.C. § 3142(e).

In assessing the defendant's risk of flight and the safety of the community, Congress has directed courts to consider several factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug"; (2) "the weight of the evidence against the person"; (3) the "history and characteristics of the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g) ("Section 3142(g)").

In seeking pretrial detention, the Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address these risks. *United States* v. *Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *United States* v. *Friedman*, 837 F.2d 48, 29 (2d Cir. 1988); *United States* v. *Shakur*, 817 F.2d 189, 195 (2d Cir. 1987); 18 U.S.C. § 3142(f).

"If a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). Such a review "shall be determined promptly." *Id.* A district court undertakes a *de novo* review of a magistrate judge's decision to release or detain a defendant. *See United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985); *Gotti v. United States*, 358 F. Supp. 2d 280, 283 (S.D.N.Y. 2005); *United States v. Smith*, 2002 U.S. Dist. LEXIS 21778, No. 02 Cr. 1399, 2002 WL 31521159, at *1 (S.D.N.Y. Nov. 13, 2002). A bail hearing may be reopened only "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are

conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2).  *See also United States v. Rivera*, No. 09-CR-619 (SJF), 2010 U.S. Dist. LEXIS 39641, *9 (E.D.N.Y. April 21, 2010) (declining to reopen bail hearing where defendant was ordered detained after a hearing before Magistrate Judge and waited approximately 8 months to apply to District Court for bail; "[Defendant] has not demonstrated that the circumstances concerning his bail application have significantly changed since Magistrate Judge Orenstein's detention order so as to warrant reopening the detention hearing and releasing [defendant] on bail.")  (citation omitted).

      B.      <u>Discussion</u>

Because the defendant poses a significant risk of flight, continued pretrial detention is warranted.

            1.      <u>The Nature and Circumstances of the Offense Weigh in Favor of Detention</u>.

As set forth in detail at the bail hearing and in the criminal complaint ("Compl.") filed in this matter, the defendant participated in a massive fraud scheme that involved the "theft of literally thousands of credit cards" and the "use of false identification information."  (Tr. 2.) Through her participation in the fraud, the defendant had access to substantial financial resources.  For example, during a search of the defendant's apartment, the Government recovered approximately $20,000 in cash from a purse stored in Saelim's closet.  (Tr. 4).  The same closet stored approximately 60 credit cards, most of which were in the names of individuals other than Saelim, as well as gift cards that were apparently used to store money obtained from the fraud.  (Tr. 4-5).

The defendant used the fraudulent proceeds to purchase luxury goods, as well as to pay for her personal living expenses.  The investigation revealed, for instance, that stolen credit cards

4

were used to purchase personal items such as pet insurance for Saelim's dog, and to order takeout meals delivered three times a day to the defendant's apartment. (Compl. ¶ 9.) Moreover, a Mercedes-Benz seized at the time of the defendant's arrest was registered in her name. Significantly, prior to being transferred to the defendant's name, Phattrawa Le – Saelim's mother – was listed as the owner of the car. Given that, according to the defendant, Le earns just $10,000 a year, it is unclear how she would be able to afford a luxury automobile. (Def. Ltr. at 1.)

An additional approximately $175,000 in cash and gold was seized from financial accounts and a safe deposit box in the defendant's name. (Tr. 4, 9, 16.) Although these seizures were significant, the Government's investigation has revealed that the defendants attempted in excess of $7,000,000 in fraudulent credit card charges. Accordingly, it is likely that the Government has not yet identified or recovered all of the defendant's assets, heightening the danger that she may flee.

The sentencing range suggested by the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") also heightens the defendant's incentive to flee. The Government currently estimates that the defendant's Guidelines range is at least 234 to 286 months' imprisonment, including a mandatory minimum term of two years' imprisonment. This exceeds the 15-year estimate the Government provided at the bail hearing, primarily because the Government has identified additional fraudulent losses associated with the defendant's scheme.

As Magistrate Judge Pitman noted, this case involves "huge amounts of unexplained wealth" and "a massive fraud that went on for a substantial period of time and netted hundreds of thousands of dollars." (Tr. 25-26). Magistrate Judge Pitman also noted, presciently, "Maybe it will break the seven-figure mark by the time the Government's investigation is over." (Tr. 26).

Indeed, the Government's continued investigation has confirmed additional losses attributable to the defendant's fraudulent conduct.

In an attempt to downplay the serious nature of her offenses, the defendant notes that she is "not charged with a crime of violence [or] a narcotics offense." While that is no doubt true, it does nothing to mitigate the fact that she is facing an enormous Guidelines sentence, clearly had (and likely still has) access to substantial financial resources, and engaged in conduct that, by its very nature, involved fraud and deceit. On this record, the nature of the crime weighs in favor of continued detention.

2. The Strength of The Evidence Weighs Heavily in Favor of Detention.

The strength of the Government's case against Saelim is overwhelming, and weighs heavily in favor of detention. As Magistrate Judge Pitman recognized, the Government's case against Saelim is "extremely, extremely strong." (Tr. 25). Indeed, since the bail hearing, the case has only gotten stronger. Most significantly, the Government has now obtained video surveillance footage from a bank which captures Saelim negotiating a fraudulent check drawn on a victim's bank account, and withdrawing money from the bank. At the time of Saelim's arrest, the Government seized from her purse bank receipts for a $23,000 deposit and a $5,000 cash withdrawal that correspond to the transactions captured on the video surveillance, leaving no doubt that Saelim was directly and personally involved in the fraud.

The defendant's assertion that "[i]t is clear from a review of the discovery material that all of the evidence . . . is circumstantial" is thus plainly contradicted by the record. Defense counsel also misrepresents the Government's theory of the case in stating that the Government believes "Saelim did not directly commit any fraud or identity theft," and instead was merely "aware" of the fraud and "shared in [Khandakar's] illicit gains." (Def. Ltr. at 4). This assertion is puzzling both in light of the discovery provided to defense counsel, as well as the extended

6

plea negotiations that have occurred.  In truth and in fact, Saelim directly and personally participated in the criminal conduct with which she is charged.

In addition to the video surveillance described above, physical surveillance conducted by the Secret Service confirmed Saelim's direct role in the fraud.  Specifically, Saelim was observed attempting to purchase items at a Walgreens using four separate credit cards, all of which were declined.  (Compl. ¶ 46).

The Government's investigation also has revealed that several fraudulent credit card transactions were processed using the defendant's iPhone through payment processing software known as "Square," once again confirming her direct role in the fraud.  Thus, contrary to defense counsel's assertions, the Government's theory is not that Saelim was merely aware of the fraud and shared in its gains, but rather that she actively and directly committed credit card fraud, wire fraud, bank fraud and identity theft together with Khandakar.

The defendant also contends that the Government's case is not as strong as it appears because the Second Circuit's recent decision in *United States v. Nkansah* renders "at least two of the counts charged in the indictment . . . legally insufficient."  (Def. Ltr. at 4.)  Although the defendant fails to identify which two counts she believes are legally insufficient, it appears she is referring to Counts Two and Three of the Indictment.  The defendant's argument not only misreads *Nkansah*, it misreads the Indictment as well.

As the Court is aware, Count Two of the Indictment charges the defendant with conspiring to commit both mail fraud and bank fraud, in violation of Title 18, United States Code, Section 1349.  Thus, even if *Nkansah* precluded the Government from proceeding on the bank fraud conspiracy (and it does not), there would be no impediment to proceeding on the mail fraud conspiracy.

7

As to Count Three, it charges the defendant with aggravated identity theft in connection with both Counts One and Two.  Accordingly, even if the Court ultimately dismissed Count Two, the defendant would nonetheless face a charge of aggravated identity theft in connection with her participation in the access-device fraud conspiracy charged in Count One.

Simply put, the evidence overwhelmingly establishes that the defendant personally and directly participated in the crimes charged in the Indictment.  As Magistrate Judge Pitman recognized, the Government's case is "extremely, extremely strong," and therefore this factor weighs heavily in favor of detention.

       3.    <u>The History and Characteristics of the Defendant Weigh in Favor of Detention</u>.

The defendant is an alien who faces almost certain deportation following her conviction.  She has no ties to the New York area, and significant ties to Thailand.  Finally, as Magistrate Judge Pitman noted, the defendant's statement to Pretrial Services that Khandakar was employed as a stock trader "seems to be a lie and a false exculpatory statement which is evidence of consciousness of guilt on her part."  (Tr. 25.)

In addition to these facts, it appears that the defendant may have engaged in additional criminal conduct in the form of federal benefits fraud.  Specifically, the defendant received Medicaid from October 1, 2009 through August 2, 2012.  During the same time period, the defendant owned a luxury car, 13 luxury handbags, and had $25,000 in cash in her apartment.  Although the Government's investigation is ongoing and the defendant has not yet been charged with benefits fraud, it is difficult to square the defendant's significant assets with her purported eligibility for federal benefits.

The defendant also places great emphasis on the fact that "she does not have a criminal record, and this is her first arrest." (Def. Ltr. at 4).  That statement is inaccurate.  In fact, the

8

defendant was arrested on or about August 7, 2011 and charged with torturing and injuring animals, in violation of New York Agriculture and Markets Law Section 353.  However, even if the defendant had no prior arrests, that fact would not be particularly relevant to an analysis of whether she is flight risk.  Given the fact that is not a citizen, lacks ties to the United States, and was caught in an apparent lie to Pretrial Services, the defendant's history and characteristics weigh in favor of detention.

## Conclusion

The defendant is charged in connection with a massive and sophisticated fraud scheme that resulted in millions of dollars of loss.  She faces a mandatory minimum sentence of two years' imprisonment, a maximum sentence of nearly 40 years' imprisonment, and a Guidelines sentence of approximately 20 years.  She lacks ties to the United States; indeed, she is an alien who faces almost certain deportation if convicted.  As Magistrate Judge Pitman recognized, the Government's case is "extremely, extremely strong." (Tr. 25.)  In light of these facts, the Government has established by a preponderance of the evidence that the defendant is a risk of flight, and that there are no conditions or combination of conditions to assure her continued appearance before this Court.  Accordingly, continued pre-trial detention is appropriate.

Dated: New York, New York
       November 27, 2012

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney

By:     /S/
        James J. Pastore, Jr.
        Assistant United States Attorney
        Tel.: (212) 637-2418